The next matter on our calendar is the Centrellas v. RitzCraft Corporation. We have Appeals and Cross-Appeals. Yes, Your Honor. So why don't we start with the, so you're both move-ins really. Why don't we start with the Centrellas and then hear from RitzCraft. Is that okay? Or were you planning to do it otherwise? We were planning to do it otherwise. Do it whichever way you were planning. Are you sure, Your Honor? We conferred. I thought, I'm Stephanie DeVitore. I represent RitzCraft. You represent RitzCraft. I was going to say. Okay, so you can go first. And then you'll get some rebuttal time to talk about the cross-claims. And you, Mr. Simmons, will have to do your direct and cross-claims in your argument. I can't. Can I reserve a minute? You can reserve a minute for your rebuttal on the cross-appeal. Okay. Okay. Thank you. Now that we got that straightened out. So this is RitzCraft. That's you, Mr. Simmons. Go on. Introduce yourself. May it please the Court, Your Honor. My name is Stephanie DeVitore. And I represent RitzCraft Corporation, a manufactured home builder centered in Pennsylvania. We were sued by. You can raise that. You know, it was lowered. There's a. It's wonderful, isn't it? Thank you. The Centralis purchased a home from Mountain View, a builder, because my client doesn't sell directly to consumers. And the builder was responsible for all of the foundation construction and assembling the units. And the builder did an awful, woeful job, resulting in a very energy insufficient home. Does RitzCraft have any responsibility for the quality of the builder's work? No, Your Honor. It's our contention that we did not. Didn't you, on your website, say that you did? We, on our website, said that we would back our homes. But we'd issued. We were. The advertising materials were clear that we offered a one-year warranty for the. For just the parts you supplied? For what we supplied. Not the construction of the home? Correct. But do you think that the Centralis understood that? They took a tour of the factory, didn't they? They did take a tour of the factory. Didn't you tell them the house would meet all the building codes when they took the tour of the factory? The portion, excuse me, Your Honor, the portion of the home that we manufactured would. The other issue is that these plaintiffs, although consumers, were very educated. The Centralis had researched manufactured home building for years before they entered into the contract with Mountain View, and, in fact, selected Mountain View before it even sold Ritz-Craft homes. Then they. Why was Mountain View. They have a default judgment against Mountain View? Correct, Your Honor. Are they still in business? No. As far as we are aware, they are not. The plaintiffs, the Centralis, have a default judgment against Mountain View, as does Ritz-Craft, on its claim for indemnification under our building. You have a judgment against them, too? Correct. They indemnified you? Correct. But had no insurance or any performance bonds, too. But the court found that the Centralis didn't have expressed knowledge regarding the responsibility for the work performed by Mountain View and, as a result, allowed the Consumer Protection Act claim to go to the jury. We believe that's an error. When the evidence showed that the plaintiffs, the Centralis, knew Mountain View would be the builder and they knew they were paying over $145,000 to Mountain View alone for the work that Mountain View was performing, Mrs. Centralis attempted. The amount of the jury verdict that they won against Ritz-Craft was just for the building materials that you supplied to Mountain View. That's correct. The $92,000. It was approximately, I believe, $94,000 and some change. Mountain View came up with its own pricing, but what Ritz-Craft charged Mountain View for the home, for the units that it sold, it was $94,000. What good was the materials that you supplied when they were improperly installed in the home? I mean, you had to have some responsibility, didn't you, for the fact that the heating never worked, it leaked, the insulation wasn't properly installed, all of that. Didn't you take any responsibility? No, Your Honor, because that wasn't work that we performed. We warranted that we would produce the units from our factory, which we did. And that kind of goes to our third ground for appeal concerning the expert evidence. There was no contention from the beginning of this case until the second day of trial that the work that Ritz-Craft performed was improper. There was none. Didn't the judge give you some sanction-related relief on the expert testimony? Weren't you allowed to cross-examine the expert and bring your own expert in response? We were, Your Honor, but we submit that that's not sufficient. It was extremely prejudicial. The entire theory of this case was that Mountain View failed to perform its obligations. So the judge tried to make it right. Right, but there was no explanation whatsoever for a complete disregard of the obligations under Rule 26. The rule is clear and the case law is clear that expert opinions must be contained in the report or supplemental report. There was none. And so then it has to be harmless error or some rationale for the . . . So what exactly did the judge do in response? First, they allowed you cross-examination on the new finding and they allowed you to bring a witness to rebut that finding. Didn't the judge allow that? He allowed us to cross-examine and he allowed . . . And that's all we ever do in an adversary proceeding. But, Your Honor, we submit that there's still, as we sit here today and I read Attorney Simon's briefs, there's no explanation whatsoever for the failure to comply. So you wanted the sanction of getting it out of the trial. It absolutely should have been out of the trial. But that is like the atomic weapon sanction instead of something that was more moderate. Yes, but, Your Honor, when it's such a fundamental issue, I mean, to come in on the second day with having never said that Ritzcraft had any improper design or defective construction, we submit that that is the ground for the atomic sanction, as in the DVL decision and the other case law cited in our brief. All right. Now, do you want to take a moment that remains and talk about your cross-appeal? And your cross-appeal is what? Oh, on the . . . well, you've been talking about it. On the VCPA, that's your main appeal. And what else? The other issue we have is that we expressly requested the ability to have the jury complete special interrogatories. There were at least . . . You asked for special interrogatories? We did, Your Honor. But the judge found no case law, Vermont case law or rules, requiring him to give special interrogatories. That's correct. Rule 49 authorizes a court to require special interrogatories. And we submit that, based on the case law under the Consumer Protection Act that requires specific findings, that our request for special interrogatories should have been granted. Are the special interrogatories that you suggested in the record, are they in the appendix? Your Honor, I apologize.  We did. We had submitted proposed jury instructions, which included special interrogatories for asking each element. But if we wanted to look at what you proposed . . . I believe it would be in there. Where would we find it? It would be in our proposed jury instructions, and it was also addressed during the charging conference. Okay. That's not an answer. Where would we look to find what you have now just described, your proposed jury . . . not the proposed jury instructions, the proposed specific interrogatory? I'm sorry. I misspoke. I meant the proposed specific. We submitted . . . Where would we look? In the appendix. In the appendix? Yes. And will you tell us what pages those are when you get up again? Yes, I will. Thank you. Thank you. Okay. We'll hear from the Centrellas now, and you will just have a seat. Thank you. May it please the Court. I'm Josh Simons, together with my co-counsel, Catherine Kent. We represent Mary Brennan Centrella and Carmine Centrella in the back of the room. I will reach first a question you posed and correct on the record that the portion of the home that Ritz-Craft made promises about was really the whole home. There is quite a powerful corporate video that has shown anybody who inquires about a Ritz-Craft home . . . It's available both on a YouTube channel and embedded in their website, where the president of the corporation speaks to prospective homeowners, which is exactly what the Centrellas was. And they went to the factory, too. And then they went to the factory. And the important thing here is that Ritz-Craft, on the front end of these deals, Ritz-Craft is selling to the homeowner. That's . . . they use the word you and they present to the person purchasing the home. And what they're purchasing is a Ritz-Craft home, not a series of modules. And they make representations about the energy efficiency and that it will meet code. And obviously, that can't happen as to energy efficiency, unless it's an intact home. A pile of lumber on the ground cannot be energy efficient or inefficient. It's just a pile of lumber on the ground. What happens after they collect their money from the homeowner, and in this instance, it was the $94,000 that's been stipulated to . . . The Ritz-Craft disappears from the scene. And, contrary to the representation that this is going to meet code, which they were told . . . They said, whatever level of home you buy, it will meet Vermont building code. Contrary to that representation that was made during the factory tour, this home had what's known as a blower door test on it. And, the specifications in the Ritz-Craft drawings are three air exchanges per hour. The code requirement for Vermont is five air exchanges per hour. And, this home has ten air exchanges per hour. And, that is like having a window the size of this podium, constantly open. They specifically were looking at one of the harshest environments. Islemont is beautiful. They call it God's country, because perhaps only God would want to go there. It is barren, northern Vermont, up on the lake. It's a big, cold place. So, energy efficiency is critical. The situation, ironically, of Mountain View not being before you, speaks to another issue in this case, which is that the way this deal is presented to consumers, Mountain View and Ritz-Craft are layered on top of each other. And, they're both layered legally, meaning that Mountain View is a licensee of Ritz-Craft content. So, the juggernaut selling machine is all integrated. And, Ritz-Craft boasts on the materials that are both on its own website and on Mountain View's website about how robust its builder network is, how developed these relationships are. But, they don't guarantee Mountain View's work, do they? There is no express guarantee of the work. There were expressed statements by the president of the corporation that they would stand by the home. So, as noted before, the modules are not the home. The home is the home. And, if you look at the video, another critical part of this welding of the builder and the manufacturer, is that the video shows full homes. And, it shows people doing the work that is actually the work of the Mountain View or whoever the builder is who's on site. But, that's part of the Ritz-Craft video. It shows them doing what is known as stick building, building that can't be done in the factory. So, some of it in a house like what the Centrellas bought, which is a cape, there has to be significant build out on the second floor. On a colonial, for example, that has a straight two floors, it's just modules that are getting put together. In this instance, it was both downstairs and the roof, but they had to build dormers to put an extra bedroom and some plumbing upstairs. Who provided the dormers? The dormers are built out by the builder, but any time that Ritz-Craft does that, technically Ritz-Craft supplies the materials, but it still has to be built in the field. Whereas, some of the materials come actually as hunks, pre-put together, if you will. The major thing then is that they need to be knit together. It's literally called a marriage wall for this type of construction. So, is all of the material provided by Ritz? All of the materials are provided by Ritz-Craft, down to the fastener count, down to the amount... Do you provide the heating supplies? No, I'm sorry, not the HVAC. I see. But, for example... That's why it didn't work, right? In part, yes, certainly. But, for example, the tub is already there. The appliances, I believe the appliances were there. The countertops are there. It's finished, painted. So, Ritz-Craft supplies the appliances as well as the lumber? I am not 100% sure. I believe that's part of when you buy a kitchen, that's what you get. But, if it's not, you buy a kitchen that has the hookup for the fridge, where, you know, all of that. I don't quite understand. Yeah. All right, go on. Okay. So, on the issue briefly as to the admission of the testimony by our builder concerning the design issues, they were given the opportunity to rebut that testimony by cross-examination and... They didn't get proper notice under Rule 26. That's accurate. So, how did that happen? I have no better explanation for the Court other than that matters develop as you try them. You don't know what it's going to look like to... This was the ultimate legal question. You knew it was going to come up, didn't you? But, that's the thing. It actually wasn't the ultimate legal question. I may be guilty of having been greedy to get it, but it was non-dispositive testimony. And, what's more, it was always available to me as cross-examination of their expert, because their expert had a blog post which was an exhibit, Plaintiff's Exhibit 28. It's referenced in our supplemental appendix, at least by the number. But, it was a blog post on the nuance of what's called air sealing, which is the significant thing to achieve energy efficiency, how you make seams to be weatherproof for energy efficiency. And, he had blogged on that issue. And, none of those details were available in the Ritz-Craft drawings. And, it was one of the most satisfying cross-examinations of my career. And, it went completely to this issue. And, it would have been there whether or not Mr. Bradley had testified to anything. I need to move to my own issues, lest you... So, prejudgment interest is awarded in Vermont as a matter of right when the sum is liquidated or reasonably ascertainable. The sum that we sought that was in the prayer of relief was the amount of consideration attributable to Ritz-Craft. 94,000? Exactly. And, Ritz-Craft knew that at all times. As a matter of right, that triggers a legal... It's a shall situation. And, the suggestion that the court made is that somehow it was obfuscated because other damages were sought or because it didn't come clear until the time of trial is immaterial because the magic of the prejudgment interest rule is whether they know about it from day one or verdict minus one day, they have the capacity to prevent themselves from having to pay the interest. So, delay isn't a factor there. Interest may have been accruing, but they always have the right to get rid of it by tendering the money. So, that purpose of the interest rule, of the policy reason, is served here. It also is routine in the case law that discernment is made between the portions of the award that prejudgment interest is due on and portions of the award that it is not due on. Now, we didn't have any other damages that were recovered in this case. Once Mountain View dropped out. Or on our other claims. Well, weren't you on the express warranty? Weren't you suing them for the whole amount? We were suing on express warranty. We were suing on damages following the express warranty, which would have been repair damages, as well as implied warranties. And, we lost on those claims, which reaches another issue. Right, but now you're saying we always only expected $94,000. No, we, like many complaints, there were a variety of different damages that were being sought. And, on our set of claims, we were entitled to a return of consideration, and we specifically pled that and asked for that in a prayer for relief, because that's one of the remedies available under the statute. So that. We also believe, Your Honor, that the jury should have been able to hear the issue of exemplary damages. Exemplary damages are subject to what is called an actual malice standard. In Vermont, the court is well familiar with this. However, there is a tendency to look at it, to look to the language of personal ill will and all of that. And, that is not what the standard is for corporate conduct. Corporate conduct can be shown as callous disregard without any express hostility to the particular plaintiff in the case. And, in this case, there is so many layers of callous disregard and advancing the financial self-interest of the corporation before that of the consumer, that we believe there is a fundamental basis to ask the jury, who are the finders of fact in this, to test that. Is this malice in these circumstances, where you have a company that doesn't check the bona fides of the builder, that sells through a lush marketing campaign interspersed with the builder, and then, as soon as you get into the product, they step aside and they say, we have nothing to do with it. The customer is the builder's customer. The builder is our customer. We have nothing to do with the home. There is explicit deposition testimony that is provided in our brief that brings forward this complete lack of regard for the consumer after the deal has taken place. And those are the kind of circumstances which show the callous disregard that is necessary for exemplary damages. Thank you. Okay. You're welcome. Your Honor. You're going to speak now to the cross appeal. Yes. And, Judge Pierce, to answer your question, I was incorrect. The actual verdict form that we proposed with special interrogatories is not in the appendix, but it is in the underlying docket entries. It's docket entry number 95. That was filed on March 8th of 2017. And I will thank my co-counsel for letting me borrow his appendix so I could tell you that. Okay. Very briefly, with respect to the exemplary damages, we think that Judge Conroy was correct, that in order for the issue of exemplary damages to go to the jury, there had to be some evidence of ill will or wanton conduct, and that was completely lacking. Even if you accept the plaintiff's position that our advertising or our promotional materials were deceptive, there was no evidence that Ritz-Cross representatives or owners intended any personal animosity. And for a corporation, you must show that the governing officer has directed, acknowledged, or ratified such conduct. And I think the case law that's set forth in our brief and relied on by the court is clear that that evidence is lacking in this case. What about prejudgment interest? Prejudgment interest. First, we believe that because the Consumer Protection Act contains the express remedies. There's no case law that says that the Vermont Consumer Protection Act is treated differently than any other civil case. I mean, I couldn't find a case that talked about prejudgment interest. Ironically, I found two cases that I cited in one of our briefs that says there were two cases in which prejudgment interest was awarded in Consumer Protection Act claim, but it does not appear that they were both Vermont Superior Court cases. It's Vistano, and then the other one is La Lesperance, I believe, 2008 decisions. But it doesn't appear that the defendants in those cases contested the availability of those damages. But I can't think of a reason why it would be treated differently than other civil cases. Because... Why would the Vermont Consumer Protection Act be different, a lawsuit under that act, be different than any other civil lawsuit? Because if there's a statutory remedy, it's not clear that you get prejudgment interest under Vermont law. But I think even more importantly in this case, it's absolutely not correct that the damages were readily ascertainable. This complaint was filed in 2014. The plaintiffs sought the greater of the consideration to the damages due to their inconvenience, their time, their expense, the repairs, the heating costs, mental anguish, loss of news. They were seeking more than the $94,000 they paid Rich Grant. They were seeking more than the $94,000, and they were seeking all of it from Ritz-Craft. And that is clear from the consumer protection claim as well as the breach of the warranties. They were seeking to have Ritz-Craft held responsible for all of the work of the builder and those damages. It was not until sometime in 2017, more than three years after the complaint was filed, and we had gone through discovery and litigation, that there was some acknowledgment that they may be limited Is that when Mountain View dropped out? No, Mountain View dropped out very early on. They went bankrupt? They didn't actually file for bankruptcy, but there weren't any assets that any of us thought we could. So when it was just the Centrales suing Ritz-Craft, at some point they conceded that the amount in question was the $94,000 they paid? At some point they conceded that under the Consumer Protection Act they would be limited to the $94,000. So why wasn't that readily ascertainable? Because it was three years in, it was quite . . . But it was well before it went to the jury, right? Yes, but they continued to seek the full amount on the other claims. And I think Judge Conroy admitted that because the amount in dispute was the full amount, that it was not readily ascertainable. There was never a suggestion that Ritz-Craft could simply pay $94,000 and then we determine everything later. That did not occur. They never offered to pay it into the court? No, we did not. Thank you. Thank you. Mr. Simmons, just a minute or two, because I feel we've explored the issues. Two minutes for Mr. Simmons. Thank you, Your Honor. As to the prejudgment interest, counsel is correct that the only decisions in Vermont have not disturbed trial court awards of prejudgment interest. And actually, shortly before the conclusion of the trial, a third superior court decision came out, which was filed with the district court, in which prejudgment interest was awarded on a Consumer Protection Act claim. Moreover, other statutory schemes that don't specifically mention prejudgment interest in Vermont routinely get prejudgment interest. Primarily, the statute to look at refers to mechanics liens. With regard to the exemplary damage, the other thing is to just make clear that the pleadings have always said the amount of consideration attributable to Ritz-Craft or the other damages. But weren't you seeking the whole amount from Ritz-Craft? We were seeking the whole amount of damages from Ritz-Craft that we could get. The consideration remedy is very specific that it's attributable to that defendant, so we always conditioned it as attributable to. We knew that we would never be able to get the full $254,000 that was spent from one defendant, one or the other. We were only able to get the consideration. You argue that it's readily ascertainable. Yes, it was. With regard to the exemplary damages issue, I think it's critically important to understand that the president of Ritz-Craft was responsible for creating the marketing program. This was conduct engaged at from the very top. And ironically, the situation we find ourselves both in, him without an indemnitor and us without the rest of our damages, has everything in the world to do with how good investigation they did of this company that they branded. They promised that they certified these builders. Right. Approved builders. Thank you, Your Honor. Thank you very much. Thank you both very much.